IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAVID GUZMAN,

        Plaintiff,

vs.                              No. CIV  99-626 LFG/KBM

CITY of ALBUQUERQUE, and
SAL BARAGIOLA, Deputy Chief,
RUBEN DAVALOS, Captain, and
PAUL CHAVEZ, in their individual capacities,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment [Doc. 54]. Defendants City of Albuquerque ("the City"), Sal Baragiola ("Baragiola"), Ruben Davalos ("Davalos"), and Paul Chavez ("Chavez") were granted permission to file this dispositive motion past the deadline set in the Court's case management plan. Plaintiff David Guzman ("Guzman") opposes the motion. In accord with the District's motion practice rule, the motion, response, and reply were simultaneously filed on July 19, 2000. For reasons stated below, the motion is denied.

### Discussion

Guzman, a former sergeant with the Albuquerque Police Department ("APD"), brings claims under Title VII and 42 U.S.C §§ 1983 and 1985(2), alleging employment discrimination, retaliation, and conspiracy to violate his constitutional rights. He claims that Defendants transferred him to a less prestigious position within APD and thereby forced his retirement, in retaliation for his bringing an EEOC claim and for filing litigation and speaking out on issues of public concern relating to

discrimination in APD.  The facts and procedural history of this case were set out in the Court's Memorandum Opinion and Order of May 26, 2000 [Doc. 45], granting in part and denying in part the City's first motion for summary judgment, and will be repeated here only to the extent necessary to this opinion.

Defendants seek summary judgment in their favor, on four grounds:  (1) the three individual Defendants are entitled to qualified immunity on the § 1983 claims; (2) Guzman's claims under 42 U.S.C. § 1985 are barred under the intracorporate conspiracy doctrine and for failure to state a claim; (3) with regard to the claim under Title VII, Defendants have established a legitimate nondiscriminatory reason for Guzman's transfer in 1998, and Plaintiff has failed to raise a jury issue as to pretext under the burden-shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973); and (4) the claims against all Defendants are barred under the doctrines of collateral estoppel and *res judicata*.  None of these grounds has merit.

<u>Qualified Immunity</u>

Government officials performing discretionary functions are entitled to qualified immunity from civil liability, so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  A constitutional right is "clearly established" if the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987).

There is no question that, as of 1998 when the alleged retaliatory transfer took place in this case, a reasonable official would have understood that to punish a public employee for exercising his right of free speech would violate the First Amendment.  Wulf v. City of Wichita, 883 F.2d 842, 865

n.33 (10th Cir. 1989). It is "axiomatic" that a governmental entity cannot condition employment "on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Schalk v. Gallemore, 906 F.2d 491, 494 (10th Cir. 1990), *quoting* Connick v. Myers, 461 U.S. 138, 142, 103 S. Ct. 1684, 1687 (1983). But this states the issue too broadly. "[Plaintiff] cannot persuade the court that the law is clearly established by stating . . . broad legal truisms." Wulf, at 865 n.33. To withhold qualified immunity, the "unlawfulness of the 'very action in question' must be apparent." Considine v. Bd. of County Comm'rs, 910 F.2d 695, 702 n.7 (10th Cir. 1990).

In analyzing a claim of qualified immunity in the context of a public employee's allegation of retaliation for exercise of his First Amendment rights, the court must employ a multi-tier test. Schalk, at 494. First, the court must determine whether the plaintiff has alleged a true violation of his freedom of speech, which requires a two-part inquiry: (1) whether the speech relates to matters of public concern, Connick, 461 U.S. at 146, and (2) whether the employee's interest in the speech outweighs the government's interest in the maintaining an efficient workplace. Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 1735 (1968). If the Connick / Pickering analysis establishes a true violation, then the Court must determine whether the right violated was "clearly established" at the time the adverse employment action was taken. Lee v. Nicholl, 197 F.3d 1291, 1294 (10th Cir. 1999).[1]

---

[1]The First Amendment / retaliation cause of action includes another element: the requirement that the plaintiff show that his speech was a motivating factor in the adverse employment action and, if the employee makes this showing, the employer is allowed a chance to show that it would have made the same decision in the absence of the protected speech. Schalk, at 497; Paradis v. Montrose Mem'l Hosp., 157 F.3d 815, 818 (10th Cir. 1998). Defendants have not raised this issue in their discussion of qualified immunity. Resolution of the "motivating factor" issue requires factual determinations concerning intent which are not ordinarily amenable to determination on summary judgment, Schalk, at 497; Prager v. Leftover, 180 F.3d 1185, 1190 n.5 (10th Cir.). *cert. denied*, 120 S. Ct. 405 (1999); and is problematic in the context of qualified immunity. *See*, 1B Martin A. Schwartz & John E. Kirklin, Section 1983 Litigation

Determining whether the law was "clearly established" is a difficult undertaking with regard to First Amendment claims. "It is particularly difficult in the First Amendment context to determine whether the applicable law was 'clearly established' because the Connick public concern inquiry and the Pickering balancing test are to be performed in light of particularized facts on a case-by-case basis." Considine, at 702; Wulf, at 864. Especially where a Pickering balancing analysis is required, the law is less likely to be well-established than in other cases, Schalk, at 499; Wulf, at 864-65, thus making a finding of qualified immunity more likely. However, such a finding is not inevitable; see, e.g., Wulf, Paradis, and Considine, all cited supra. The Court must relate the qualified immunity inquiry to the particular facts of the case.

A. Matter of Public Concern

Employee speech relates to matters of public concern if it can be "fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. In making the "public concern" analysis, the Court must examine the "content, form, and context of a given statement." Id., at 147-48. Speech which pertains to a government agency's discharge of its public responsibilities, David v. City and County of Denver, 101 F.3d 1344,1355 (10th Cir. 1996), or which pertains to corruption, impropriety, or malfeasance on the part of public officials, Schalk, at 495, will ordinarily be regarded as addressing matters of public concern. The Court should distinguish between speech which is "directed at a public issue" and that which is "merely an attempt to redress personal grievances." Paradis, at 818. Speech relating to internal personnel disputes and

_____

§ 9.21 (3d ed. 1997). The parties in their briefing address the issue of intent in their discussion of "legitimate business justification" and "pretext" under Title VII, rather than under a qualified immunity analysis. In any case, the Court finds that summary judgment is not appropriate on this issue, whether raised under qualified immunity or Title VII.

working conditions is not generally seen as addressing matters of public concern, <u>David</u>, at 1355; however, an employee's statements made to protect a colleague or colleagues from discrimination are not properly characterized as mere personal grievance. <u>Paradis</u>, at 818. "The pertinent inquiry is whether the actor is speaking as a citizen or an employee." <u>Schalk</u>, at 495. In the context of a claim of qualified immunity, the question is whether it would have been clear to a reasonable official that the plaintiff's statements were addressed to matters of public concern, rather than being unprotected statements of personal grievances. <u>Schalk</u>, at 499.

Guzman's primary motivation for his advocacy may well have been personal, that is, Guzman's private interest in securing a promotion, and his personal anger at the repeated rejections. Still, it is clear that Guzman spoke out against discrimination generally, and was an advocate for employee interests far beyond his own. Guzman, formerly a sergeant with APD, states that he has been a vocal opponent of discrimination within APD since 1976. He alleges that he was removed from his position with the Narcotics Interdiction Unit and transferred to an entry level (or at any rate, a less prestigious) sergeant's position, in retaliation for speaking out against discrimination as an officer of the Chicano Police Officers' Association and Latino Police Officers' Association; for filing EEOC charges alleging anti-Hispanic discrimination; for his participation in the 1994 Alianza lawsuit, which alleged racial discrimination and retaliation by APD, as well as his participation in the mediation process arising from that lawsuit; for the fact that he filed a civil rights lawsuit in 1997, again alleging anti-Hispanic discrimination and retaliation for engaging in protected speech; and for his participation in a lawsuit filed by police detective Oscar Medrano in July 1998.

In addition, Guzman alleges that the transfer was done in retaliation for the fact that he complained to Defendant Chavez about the conduct of Defendant Davalos in connection with a

domestic violence incident involving a gun, and that he complained to Chavez and APD Internal Affairs about the conduct of Defendant Davalos in connection with alleged irregularities in his conduct of a narcotics investigation.

In undertaking the above activities, Guzman was clearly speaking out on matters of public concern, in addition to his purely personal interests. "The right generally to make statements critical of public officials has been long recognized as a protected First Amendment right . . . That right applies to policemen no less that to other public employees." Wulf, at 865. If a public employee's statements naturally suggest that, if true, the government agency for which he works is not properly discharging its duties, the statements will be seen as touching on matters of public concern. Considine, at 700.

Guzman's statements, as described above, meet this test. While the focus of his advocacy was personal, he also alleged racial discrimination and retaliation at APD, as well as improprieties by a prominent police official, and he spoke out, in the Alianza mediation process and other forums, on behalf of other police officers. This speech goes beyond his mere personal grievances. Even when a police officer's motivation for engaging in speech critical of his department is partially due to personal gain or the result of a vendetta, the speech will nevertheless be seen as touching "public concern," if it involves important community issues and does not pertain solely to matters of internal significance. Beach v. City of Olathe, 97 F. Supp. 2d 1065 (D. Kan. 2000).

> Because these specific complaints prompted an expression of concern about the inability of the sheriff's office to carry out its vital public mission effectively, we conclude that Cromer and the other members of the [black officers'] Association spoke as citizens, not merely as employees . . . Of course, the allegations themselves, about racial discrimination within a law enforcement agency, are matters of serious public import . . . [T]he letter was not the expression of a single

> disgruntled employee about a personal employment dispute . . .  The
> public has a fundamental interest in effective law enforcement
> organizations that are free of discrimination.

Cromer v. Brown, 88 F.3d 1315, 1325-26, 1327 (4th Cir. 1996).

The Court finds that Guzman's statements meet the Connick test, and a reasonable supervisor in Defendants' position in the fall of 1998 would have been aware that Guzman's statements were addressed to matters of public concern.

B.  The Pickering Balancing Test

The task under the Pickering balancing test is to weigh the interests of the public employee, as a citizen, in commenting upon matters of public concern, against the interests of public agency, as an employer, in "promoting the efficiency of the public services it performs through its employees." Schalk, at 495, quoting Pickering, at 568.  Factors to consider include the "time, place, and manner of the employee's expression," whether the employee's statements impair discipline by superiors or harmony among coworkers, impede the performance of the speaker's duties, or interfere with the operation of the agency.  Considine, at 701.

In determining whether a defendant is entitled to qualified immunity, the question is whether the protected nature of the plaintiff's speech was sufficiently clear so that the public official defendants should have been on notice that their asserted interest in preventing disruption would not survive a balancing inquiry.  Schalk, at 499.  Where courts in analogous, but not necessarily factually identical, cases have conducted the necessary Pickering balancing test, "government officials will be deemed 'on notice' that their actions will be measured according to clearly established law and qualified immunity may not be available to them."  Paradis, at 819.

7

As noted above, a police officer has a constitutional right to make statements critical of his supervisors. However, "it has also been recognized for some time that the state's interest in regulating its police force can be exceptionally compelling." Wulf, at 865-66 (internal punctuation omitted). There are important interests on both sides, and each must be evaluated in relation to the other. In Wulf, the Tenth Circuit found that a police officer's activities in speaking out against his police chief's anti-union animus was protected activity which outweighed the interests of the police department in maintaining discipline and efficient operations. "Once an employee's speech is determined to touch on a matter of public concern, the discharge [or other adverse employment action] can be legitimate only if the government's interest outweighs that of the speaker." Considine, at 701. The governmental defendant bears the burden of producing evidence demonstrating a disruption in services, or loss of departmental efficiency or a significant interference with departmental operations, which results from the employee's speech. Schalk, at 496. In Lee, the defendant's failure to show actual disruption was the factor which decided the Pickering issue. Lee, at 1296.

Defendants in the present case have not demonstrated that Guzman's interest in speaking out was outweighed by APD's interest in maintaining efficient operations. They have not demonstrated, or even alleged, that Guzman's speech was done in a time, place, and manner which disrupted APD operations, nor have they shown that his statements impaired discipline within the police force or interfered with his job duties as a police sergeant. "The public interest in free and open debate about its police department's operations is vital." Wulf, at 866. "When balancing the rights of the employee against those of the employer, an employee's First Amendment interest is entitled to greater weight where he is acting as a whistle blower in exposing government corruption." Conaway v.

Smith, 853 F.2d 789, 797 (10th Cir. 1988).  Without a showing that Guzman's criticism and litigation activities interfered with the government's interest in regulating its police force, the Pickering balance must weigh in favor of the right to speak out.  Given Tenth Circuit precedent, the Court finds that a reasonable police official in 1998 would have realized this.

C.  Conclusion

The Court finds that the contours of Guzman's right to criticize the police department and his superiors was sufficiently clear as of 1998, so that reasonable officials in the individual Defendants' position would understand that punitively transferring him to a low-level position in retaliation for his speech violates his constitutional rights.  Accordingly, the individual Defendants, each of whom is alleged to have been personally involved in the transfer decision, are not entitled to qualified immunity in this case.  It is up to the jury to decide whether the transfer was in fact retaliatory; that is, whether plaintiff's protected speech was a substantial or motivating factor in the adverse employment action, or whether the employer would have made the same decision in the absence of the protected speech.  Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir. 1996).

The Section 1985 Claim

Section 1985(2) provides a federal cause of action for recovery of damages when two or more persons conspire to deter, by force, intimidation, or threat, any party or witness from attending federal court or from testifying freely, fully, or truthfully to any matter pending therein; or when two or more persons conspire to injure such party or witness, in person or property, on account of his having so attended or testified.  42 U.S.C. § 1985(2).

Guzman alleges that "the defendants named herein or some of them" conspired to deter him, by intimidation in the form of the forced transfer, from testifying freely, fully, and truthfully in his

1997 lawsuit, as well as in a separate suit brought by Detective Oscar Medrano against APD officials claiming retaliation for exercise of his First Amendment rights. (D.N.M., Civ. 98-828 JP/JHG, filed July 9, 1998). Defendants raise the "intracorporate conspiracy" doctrine in defense, arguing that a § 1985 action is unavailable when, as here, a corporate entity is charged with conspiring with one of its own agents. In addition, Defendants argue that Plaintiff has not demonstrated that the individual Defendants used force or intimidation to prevent him from attending or testifying in a federal court proceeding, and because Guzman's claim is for "economic retaliation," to which § 1985(2) does not apply.

The Tenth Circuit rejects the "intracorporate conspiracy" doctrine as a defense in a civil rights action, and so must this Court in the present case. Brever v. Rockwell Int'l Corp., 40 F.3d 1119 (10th Cir. 1994). Brever involved claims of former plutonium workers who alleged that the defendants conspired to deter their testimony before a grand jury investigating possible crimes at the Rocky Flats nuclear plant in Colorado, and conspired to retaliate against them after they did testify. The Tenth Circuit noted that, "[t]he elements of a deterrence claim under section 1985(2) are (1) a conspiracy, (2) to deter testimony by force or intimidation, and (3) injury to the plaintiff," and the first element, a conspiracy, requires "the combination of two or more persons acting in concert." Brever, at 1126. Noting that defendants invoked the "intracorporate conspiracy doctrine," under which a corporation cannot conspire with its corporate agents, the Court noted that the doctrine had been developed in the antitrust context, and:

> We have yet to determine whether the doctrine precludes intracorporate conspiracies in civil rights actions. A majority of other circuits have addressed the issue with divergent results. Five circuits have extended the intracorporate conspiracy doctrine to actions under sections 1983 and 1985, while four others have severely limited or

10

> questioned the applicability of the doctrine in the civil rights context.
> We agree with the latter group of courts that the doctrine, designed
> to allow one corporation to take actions that two corporations could
> not agree to do, should not be construed to permit the same
> corporation and its employees to engage in civil rights violations . . .
> In these situations, the action by an incorporated collection of
> individuals creates the 'group danger' at which conspiracy is aimed,
> and the view of the corporation as a single legal actor becomes a
> fiction without a purpose.  [Some internal punctuation omitted].

Brever, at 1126-27.  The intracorporate conspiracy theory is unavailable to Defendants in this civil

rights action, and the Court denies defendants summary judgment on that basis.

The court in Brever also noted (at 1127):

> Moreover, even those circuits that extend the doctrine [of
> intracorporate conspiracy] to civil rights cases would not apply it here.
> Courts have recognized an exception where an officer or agent has an
> 'independent personal stake in achieving the corporation's illegal
> objective . . .'

Defendants argue from this that Brever is distinguishable from the present case on the "independent

personal stake" basis.  However, they overlook the primary holding in Brever, which relied on a

policy judgment that the intracorporate conspiracy doctrine "should not be construed to permit the

same corporation and its employees to engage in civil rights violations"; the "independent personal

stake" basis was not the driving force behind the Brever decision.  For the same policy reasons which

motivated the Tenth Circuit, this Court holds the intracorporate conspiracy doctrine inapplicable in

the present case, regardless whether Defendants were acting for their own personal purposes.  In any

case, the Court finds there is a genuine issue of material fact as to Defendants' motivation, and

summary judgment cannot therefore be entered on this claim.

Defendants also assert that the § 1985(2) conspiracy claim should be dismissed, because

"Plaintiff has no evidence" that the individual Defendants used force or intimidation to prevent him

from testifying, and because "the Plaintiff seeks a federal tort remedy for economic retaliation based on purely work-related claims." The Court rejects these arguments.

Defendants are the parties seeking summary judgment and thus bear the burden of establishing the absence of a genuine issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). It is only after Defendants have met this initial burden that Plaintiff is obliged to adduce facts demonstrating a triable issue for the jury. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986). Thus, Defendants' mere assertion that "Plaintiff has no evidence" that Defendants used force or intimidation to prevent him from testifying will not support summary judgment in their favor.

Guzman does not allege force; rather, he claims that Defendants conspired to intimidate him, by transferring him to an entry-level position within APD, in order to deter him from testifying in the suit he had brought against APD employees and as retaliation for his previous testimony. Indeed, there is a temporal connection between the trial and the transfer. Guzman was notified of the transfer on or about July 8, 1998. The effective date was to be September 12, 1998. His lawsuit against APD employees for discrimination and retaliation (Civ. 97-1279) had been filed in September 1997 and was set to go to trial in October 1998.

In addition, the transfer came after Guzman had already testified in the Alianza case and been deposed in his 1997 lawsuit and could, arguably, have been prompted by Defendants' desire to

retaliate against Guzman for that testimony.  In addition, Guzman alleges that Defendant Davalos threatened to force him out of APD, and that Defendant Chavez was aware that Guzman wished to stay in his same position or move to a new elite squad in the reorganization, but instead Chavez transferred him to a position which Guzman viewed as inferior, and this occurred prior to his testimony in the October 1998 trial.  This evidence, while scant, is sufficient to raise issues of fact as to his § 1985(2) claim which can only be resolved by the jury.

Defendants argue also that this case represents Plaintiff's attempt to undertake "a federal tort remedy for economic retaliation for those who pursue work-related claims," rather than a true § 1985(2) conspiracy related to Plaintiff's testimony in a federal lawsuit.  Conspiracy to impose "economic retaliation for work-related claims" was the subject of the dispute in Haddle v. Garrison, 525 U.S. 121, 119 S. Ct. 489 (1998), and the Supreme Court in that case held that the plaintiff stated a cause of action under § 1985(2).  In any event, the cases cited by Defendant on this point are distinguishable.

In one of them, the Fifth Circuit held that retaliation for attempting to institute federal administrative and judicial proceedings could not be redressed under § 1985(2); rather, the plaintiff must allege "a nexus between the alleged conspiracy and a proceeding in federal court . . . [and] must further assert that they were injured on account of having attended or testified in federal court." Deubert v. Gulf Fed. Sav. Bank, 820 F.2d 754, 758 (5th Cir. 1987).  Guzman made the necessary allegation in this case and claims that he was targeted for adverse employment action because of his testimony in federal civil actions.  Guzman still must shoulder an onerous burden to link the transfer to an unlawful attempt to keep him from testifying in a federal proceeding.  Still, that issue cannot be resolved on motion.

In the other case cited by Defendants, the plaintiff "made no allegation and presented no evidence that MedicalControl used force or intimidation to prevent him from attending or testifying in a federal court proceeding . . .   His only conspiracy allegation is that MedicalControl interfered with his ability to file his lawsuit with this court, and that it interfered with his prosecution of the case once it had been filed."  James v. MedicalControl, Inc., 29 F. Supp.2d 749, 755 (N.D. Tex. 1998).  Guzman alleges more than an interference with his ability to file a case in federal court; he asserts that Defendants conspired to deter him from testifying before the fact, and to punish him after the fact.  Whether he can prove this claim at trial remains to be seen, but the jury should be allowed to consider it.  Defendants have not met their burden of showing the absence of a genuine issue of fact on Guzman's § 1985(2) claim, and that claim will remain in the lawsuit.

### Title VII Analysis

Under his Title VII cause of action, Guzman claims that his former employer, the City, subjected him to adverse employment action in retaliation for his complaints of discrimination, in violation of 42 U.S.C. § 2000e-3(a).  Such claims are to be analyzed pursuant to the McDonnell Douglas burden-shifting scheme.  Pastran v. K-Mart Corp., 210 F.3d 1201 1205 (10th Cir. 2000).

Under McDonnell Douglas Corp. v. Green, supra, the plaintiff has the initial burden of establishing a prima facie case of retaliation.  If plaintiff makes out a prima facie case, the burden shifts to the defendant to state a legitimate, nondiscriminatory reason for its employment action.  The reason must be "specific and reasonable and suffice to rebut the presumption of discrimination created by plaintiff's prima facie case."  Drake v. City of Fort Collins, 927 F.2d 1156, 1160 (10th Cir. 1991).  However, the defendant need not prove that it was actually motivated by the stated reason; it is sufficient if defendant's evidence raises an issue of fact as to whether it discriminated against the

plaintiff.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089 (1981).

Once defendant carries this burden of production, the presumption raised by the *prima facie* case disappears, and the burden shifts back to plaintiff to show that the employer's stated reason was a pretext for a discriminatory motive.  McDonnell Douglas, 411 U.S. at 802-804.  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves v. Sanderson Plumbing Prods, Inc., 120 S. Ct. 2097, 2109 (2000).  The plaintiff need not present direct evidence of discriminatory intent in order to fulfill the "pretext" requirement; it is sufficient if he presents indirect evidence of discrimination by showing that "an employer's proffered explanation is unworthy of credence."  Randle v. City of Aurora, 69 F.3d 441, 450 (10th Cir. 1995).

A *prima facie* case of retaliation under Title VII is made out when the plaintiff establishes that (1) he engaged in protected opposition to discrimination; (2) his employer subjected him to an adverse employment action subsequent to the protected activity; and (3) a causal connection exists between the protected activity and the adverse employment.  Pastran, at 1205.  The City concedes, for purposes of this motion only, that Guzman has made out a *prima facie* case (Brief in Support of Defendant's Motion for Summary Judgment, at 11); the Court will therefore proceed to the justification and pretext portions of the analysis.[2]

The City offers, as a legitimate nondiscriminatory reason for transferring Guzman, the

---

[2]The City's concession that Guzman suffered an "adverse action" is limited to this motion. Generally, a transfer with no loss of pay, benefits, or seniority does not constitute an adverse employment action.  Sanchez v. Denver Public Schools,164 F.3d 527, 532 (10th Cir. 1998).  Thus, this issue may still be raised at trial, and if the Court concludes that the transfer did not constitute an adverse employment action, Guzman's claim may be dismissed.

following justification.  A new Chief of Police, Gerald Galvin ("Galvin"), began employment with the City on May 26, 1998.  Shortly after assuming this post, Galvin began a reorganization of the Albuquerque Police Department to bring it in line with his vision of community oriented policing. Defendant Davalos was at that time Captain of Special Investigations Division ("SID").  On June 29, 1998, he met with Deputy Chief of Police Chris Padilla and was told that he would have to downsize SID by 20%.  As part of this reorganization, Davalos decided to move Guzman to the Westside Narcotics Team, a position which would involve greater responsibility than Guzman's previous position.   In July and August of 1998, more than 45 law enforcement officers were transferred to new positions within APD.  Within SID, ten officers were transferred, including three sergeants, one of whom was Guzman.  The City made these transfers in conformance  with its personnel rules, as well as with the pertinent city ordinance.  The City contends that Guzman's transfer was not a demotion, as he did not lose pay, benefits, or rank as a result of the transfer.  *See*, <u>Sanchez v. Denver Public Schools</u>, *supra*.

The Court finds that the City has raised an issue of fact as to whether it had a legitimate, nondiscriminatory reason for transferring Guzman, sufficient to rebut the *prima facie* case, and the burden shifts back to Plaintiff to show that this reason is a pretext, concealing a retaliatory motive.

As noted above, evidence of pretext may be direct or indirect; Guzman has supplied both. He claims that Defendant Davalos threatened to force him into retirement after he complained about Davalos' fitness for a promotion to Captain.  Guzman also points to the fact that he was the only sergeant transferred to an allegedly less prestigious position than the one he held prior to the reorganization, that he was better qualified than the other sergeants, and that he was the only one who had sued the department and criticized Davalos' fitness.  The City has not rebutted the allegations that

16

others, who had not spoken out, received preferential treatment in the reassignments.  Although the City claims that Guzman's transfer was not a demotion, the Court finds that this issue should be resolved at trial.

In addition, Guzman points out that his transfer notice came while his litigation against the department (the 1997 lawsuit) was underway and shortly before trial in that case was set to begin, and he argues that close temporal proximity between an employee's complaint of discrimination and the adverse employment action is a relevant factor in determining whether the employer's proffered reason is a pretext for retaliation.  Pastran, at 1206.  As was true in Pastran, the evidence in this case is far from clear on the issue of pretext, but it suffices to raise an issue of material fact as to whether the City's asserted reason for transferring Guzman is pretextual and is meant to cover up another motive, which Guzman claims was retaliatory.  These issues cannot be resolved on summary judgment and must be taken to the jury.

### Res Judicata

Defendants argue in their opening brief that all claims against them should be dismissed on the basis of *res judicata,* asserting that, since Guzman seeks damages arising from his early retirement, and because these claims were previously litigated in the 1997 lawsuit, he should be precluded from raising them in the present case.  The Court rejects Defendants' assertion that "Plaintiff's first lawsuit and the present lawsuit are based on a single transaction which was fully litigated at the 1998 trial."[3]

A.  Duplicative Claims

---

[3]Res judicata, as Plaintiff correctly points out, is an affirmative defense and should have been pled in the Answer.  F. R. Civ. P. 8(c).  However, it was cited in the Pretrial Order [Doc. 53, at 4], and the issue is properly before the Court.  Expertise, Inc. v. Aetna Finance Co, 810 F.2d 968, 973 (10th Cir. 1987).

Although Defendants' arguments of *res judicata* deal primarily with matters of damages (see Part B below), Defendants also raise, in their reply brief, the issue that Guzman is barred by the doctrine of *res judicata* from bringing a claim based on First Amendment retaliation for speaking out on matters of public concern, and for raising charges of misconduct by Defendant Davalos, because such claims were tried in the 1997 lawsuit.

The Court rejected these arguments when they were presented by the City in the Motion for Summary Judgment [Doc. 25] based on its counterclaim against Guzman. The Court found that the claim giving rise to the present suit – that Guzman was transferred to a less prestigious position in APD and was thereby forced into retirement – was not raised or litigated in the earlier case. The Court will not repeat its analysis of the *res judicata* issue, except to note that the reasoning of Johnson v. Board of County Commissioners, No. 99-2289, 1999 WL 1423072 (D. Kan. Dec. 9, 1999), cited in the Court's earlier *res judicata* analysis, was cited with approval by the Tenth Circuit in Mitchell v. City of Moore, 218 F.3d 1190, 1202 (10th Cir. July 11, 2000).

Defendants raise this issue again because of the Court's statement that Guzman will not be permitted to re-litigate any claims already decided in the prior case, "[t]o the extent his complaint could conceivably be construed to re-raise such claims." The Court now clarifies that ruling and rejects Defendants' argument that Guzman's current claim of retaliatory transfer for First Amendment activity has already been litigated.

In the earlier lawsuit, Guzman brought a § 1983 action, alleging three causes of action, including: employment discrimination due to his ethnicity, in violation of the equal protection clause; violation of his First Amendment rights to freely associate in police unions, to utilize the legal system to redress grievances, and to speak out on matters of public concern; and violation of his due process

rights in that Defendants caused Guzman to fail the oral assessments, thereby circumventing the protections of the merit selection system and stripping him of the protections enjoyed by a public employee in continued expectation of employment.

In the present case, Guzman alleges that the City violated Title VII in demoting him just as his previous case was going to trial, in retaliation for his outspoken advocacy and litigation activities and for speaking out on alleged misconduct by members of the police force.  He also alleges causes of action against three individual police officials under § 1983 and 1985(2), claiming that they conspired and were personally involved in the decision to transfer him, and that the transfer was done with discriminatory motives and to retaliate for exercise of his First Amendment rights.

In the earlier case, Judge Vazquez granted Defendants' motion to dismiss Guzman's employment discrimination claims based on alleged violations of the due process clause, holding that Guzman did not have a property right in being promoted to rank of lieutenant.  The Court soundly rejected both procedural and substantive due process claims.  The case went to trial on the First Amendment retaliation claim and the racial discrimination (equal protection) cause of action.  On the two remaining theories before the court, Judge Vazquez found for Guzman on the narrow ground that the city failed to mediate in good faith Guzman's prior dispute.  The court never found that Guzman was discriminated against in promotions, or that he had otherwise been a victim of racial or ethnic discrimination.  Even the trial court's narrow holding on failure to mediate in good faith as a result of Guzman's advocacy and union activities was ultimately reversed.

In denying summary judgment, Judge Vazquez found, with regard to the discrimination and retaliation claims, that:  (1) Defendants conceded the prima facie case; (2) Defendants failed to show, as a matter of law, that they had a legitimate, nondiscriminatory reason for refusing promotion; and

(3) Guzman raised a genuine issue of material fact as to pretext.  Ultimately, after the bench trial, the judge found that Defendants' reasons for failure to promote were in fact legitimate, and that Guzman failed to prove that those reasons were mere pretext.  The court found that remarks made by the two individual Defendants in that case, Martin Chavez and Joseph Polisar, were not evidence of discriminatory animus on their part but only of interpersonal friction with Guzman, and in any case Guzman failed to show a nexus between the remarks and the testing process.

The fact that Judge Vazquez found that the Department had a valid, non-pretextual reason for refusing to promote Guzman in 1997 (*i.e.,* he failed the lieutenant's test several times, and Guzman could not produce sufficient evident to show that the stated reason was a pretext) does not necessarily mean that the Department had a valid, non-pretextual reason for transferring him in 1998, on the eve of trial in the earlier case.  The non-discriminatory nature of remarks made by Martin Chavez and Joseph Polisar, and the relationship of those remarks to Guzman's testing and promotion process, do not tell us anything about whether the current Defendants (the City, Baragiola, Davalos, and Paul Chavez) were motivated by racial discrimination or a desire to retaliate against Guzman, in transferring him to the West Side Narcotics Impact Team.

With regard to the First Amendment claim, Judge Vazquez found that:  (1) Guzman's efforts at raising discrimination issues within the police force are matters of public concern; (2) his interest in speaking out on such matters outweighs the department's interest in efficiency and, in any case, Defendants did not present any evidence of disruption resulting from his speech; (3) the failure to mediate in good faith constituted retaliation for the lawful exercise of First Amendment rights; specifically (Findings of Fact Nos. 35-36), "Mr. Guzman has shown that his speech on discrimination in the Albuquerque Police Department was a substantial factor or a motivating factor in Defendants'

refusal to disclose . . . his testing records so that any of his efforts at mediation necessarily failed," and "Defendants have failed to show that they would have taken the same action, even in the absence of Mr. Guzman's protected speech."[4]

One of Guzman's current claims is that the department also retaliated against him in a different way – by a humiliating transfer/demotion – for the same advocacy and free speech activity, as well as for bringing the 1997 lawsuit.  Guzman's failure to join all of his claims and causes of action in one lawsuit has placed both Court and counsel in a quandary, and now results in a situation where evidence has to be limited, or considered for one purpose and not another.  It raises the problem of inconsistent results and, at least until the Tenth Circuit's recent ruling in Guzman v. Polisar, the possibility of double recovery.  Nonetheless, the Court recognized that joinder is not always feasible and that there are instances, like this one, when two trials are required.

Guzman gave reasons why this aspect of retaliation was not included in the 1997 lawsuit, and this Court has already accepted those reasons as valid.  There is, therefore, no bar to Guzman's citing the Hispanic advocacy, union activity, and other free speech actions, even though they were cited in the previous lawsuit, as a motivation for the retaliatory action which underlies his First Amendment cause of action in the present suit.  There can be two (or more) retaliatory acts arising from the same speech.  Although it would be preferable to litigate all such retaliatory acts at one time, that is not

---

[4]The one ruling favorable to Guzman in the earlier case was recently reversed on appeal. *See*, Guzman v. Polisar, No. 99-2060, slip op. (10th Cir. Sept. 15, 2000).  The Court of Appeals held that insufficient evidence was presented at trial to support the finding that Martin Chavez and Joseph Polisar were personally involved in withholding the documents requested by Guzman during mediation or that they committed any other act interfering with the mediation.  Thus, Guzman's recovery for defendants' failure to mediate in good faith has been eliminated.  This reversal, when coupled with the prior results in Guzman I means that Guzman failed on each of his three causes of action.

always possible.  The fact that the transfer came so late in the course of the 1997 lawsuit gave Guzman only two choices:  to attempt to amend his complaint in the 1997 lawsuit and basically start over with that litigation,  or else to file a new EEOC charge and begin the process of launching another suit based on the transfer-as-retaliation claim.  The timing of the retaliation made the second choice more feasible, although it significantly complicated the present lawsuit.

The Court wishes to point out that the current litigation has an extremely narrow focus. Guzman claims:  (1) that the City violated Title VII by transferring him to a low-level position in July 1998, in retaliation for his complaints of discrimination; (2) that the individual Defendants are liable under § 1983 for their personal involvement in the July 1998 transfer, allegedly done in retaliation for Guzman's exercise of his free speech rights; and (3) that all of the Defendants conspired to intimidate Guzman, by means of the July 1998 transfer, in order to deter him from testifying in the suit he brought against APD employees in 1997 and in retaliation for his previous testimony, in violation of § 1985(2).

Each of these claims focuses on the July 1998 transfer, and nothing else.  Guzman will not be allowed to introduce evidence, for example, that the City violated Title VII by failing to promote him or that it discriminated against Hispanic police officers.  Nor will he be able to present evidence of unfair testing, or perceived deprivation of rights of Hispanic officers, or any alleged failure to mediate in good faith.  He will not be allowed to show, in connection with his § 1983 claim, that the individual Defendants were personally involved in taking any retaliatory action against him, other than the transfer.  And he will not be permitted to introduce evidence of a conspiracy to deter or punish his testimony by any means other than the transfer.

22

It will no doubt be necessary for the jury to hear evidence about Guzman's earlier advocacy and litigation activity, in order for them to understand what it was that allegedly prompted Defendants to retaliate against him.  As explained in the order on the Defendants' motion in limine, evidence that Guzman engaged in these prior activities will be admitted with a limiting instruction, but the jury may not be informed of the results of the earlier litigation, at either the trial or appellate levels.  In addition, the Court expects this testimony regarding prior activities to be kept to a minimum and to be presented in a straightforward and non-emotional way.  The jury will be instructed that they are not to consider such evidence for any purpose other than as a factual basis for the retaliation claims; that is, they are not to compensate Guzman for any damage arising from his advocacy and litigation activity, other than damage arising from the transfer, assuming the jury finds the transfer to be retaliatory.   The Court encourages the parties to reach a stipulation regarding Guzman's prior activities which are alleged to have formed the basis for the retaliatory transfer, which may eliminate the need for testimony on this issue.

B.  Elements of Damage.

In resolving the City's earlier motion for summary judgment on its counterclaim for abuse of process, the Court held that, while the filing of the present lawsuit did not constitute an attempt at re-litigation so as to be considered an "improper act" amounting to abuse of process, nevertheless, Guzman would not be allowed to re-litigate any particular issues which were raised and resolved in the prior litigation, to the extent his complaint could be construed to do so.  In particular, the Court held that Guzman may recover damages in this case only for injuries emanating from the 1998 transfer which allegedly forced his retirement, and not for any injuries asserted in the prior suit.  The Court now confirms that ruling and holds that Guzman may not, in this case, recover any damages based

23

on mental anguish or emotional distress, because these elements of damage have already been raised and resolved.

Since the time of the pretrial conference, and before entry of this summary judgment ruling, the Tenth Circuit reversed Judge Vazquez's award of damages to Guzman in the 1997 lawsuit arising from his allegations of failure to mediate in good faith.  Guzman v. Polisar, No. 99-2060, slip op. (10th Cir. Sept. 15, 2000).  Although the effect of the Tenth Circuit's ruling is that Guzman will not recover the damages awarded by Judge Vazquez, it is helpful to look to the earlier litigation in order to determine which categories of damages have or have not been litigated.

At the pretrial conference, the Court noted that the record of the 1997 lawsuit established that Guzman was fully compensated for all damages based on physical, mental and emotional pain as of the date of Judge Vazquez's ruling in that case (Findings of Fact and Conclusions of Law [Doc. 68], Civ. 97-1379 MV/WWD, filed January 29, 1999), including emotional distress damages arising from his early retirement.[5]  (Transcript of Pretrial Conference Proceedings, at 5-8; hereafter referred to as "TPTC").  However, aside from emotional distress damages, Guzman has not previously litigated any claim for damages arising from the 1998 transfer/retirement.

The Court recognizes that the current litigation is intertwined with the 1997 lawsuit, in part because the retaliation claimed in the present case allegedly arises from Guzman's litigation activities in the 1997 lawsuit.  The confusion surrounding this matter arises from the following sequence of events.  The 1998 transfer had not yet occurred at the time the 1997 lawsuit was filed.  That transfer and Guzman's early retirement, which he claims was forced on him because of the unacceptable

---

[5] Indeed, with Judge Vazquez finding that Guzman suffered emotional harm, it is most likely that the monetary award contemplated future damages as well.

transfer, were not made part of the complaint in the earlier case. Guzman was notified of the transfer, and tendered his resignation, in July 1998, a few months before the 1997 lawsuit went to trial. However, Guzman did not amend his complaint to include the transfer/retirement in the issues that were litigated at trial in the 1997 lawsuit. On the prior summary judgment motion in this case, the Court accepted Guzman's explanation for failing to amend his complaint in the earlier case, including the fact that the cutoff date for amendment had expired, and the final pretrial order had been entered, by the time he was notified of the transfer. In addition, he filed an EEOC charge in August 1998 based on the July 1998 transfer and was awaiting a right-to-sue letter which did not arrive until March 1999, after trial had concluded in the first case and the Judge had issued her findings and conclusions.

In the 1997 lawsuit, Judge Vazquez awarded Guzman $75,000 in damages because of defendants' failure to mediate in good faith, and she rejected the remainder of his causes of action. In making the award, Judge Vazquez referred to the "impact the failed mediation had on him," including frustration, embarrassment, and anger, and other evidence of emotional distress raised in the testimony of both Guzman and his wife, including his developing a temporary case of Bell's palsy. Because the transfer and resignation had already occurred at the time of trial, any emotional distress suffered necessarily included emotional distress due to the transfer. Although the 1997 case did not include the transfer as part of Plaintiff's claims, Defendants correctly point out that, at the trial of that case in October 1998, Guzman and his wife both testified to the emotional distress caused by the transfer/retirement.

The Court now rules that evidence may be presented at trial of this case on any element of damage arising from the 1998 transfer/retirement, except damages based on physical and emotional distress. Plaintiff has fully litigated the issue of emotional and physical distress arising from that

transfer, including the allegation regarding Bell's Palsy, at least as of January 29, 1999, and Plaintiff notified the Court that emotional distress damages since that date are minimal in any case (TPTC, at 12). The Court cannot say with certainty that Judge Vazquez intended to exclude future damages in her January 29, 1999 ruling, and any attempt to separate emotional distress damages arising from the transfer prior to January 29, 1999, from those arising after that date, would be unworkable for the jury. Plaintiff has not previously litigated any other element of damage arising from the transfer/retirement, and the jury will be allowed to consider evidence of any damage arising therefrom, with the exception of physical and emotional distress.

## **Order**

The contours of Guzman's right to speak out on matters of public concern, in the circumstances of this case, were sufficiently clear in July of 1998 that a reasonable official would understand that a retaliatory transfer would violate that right. Defendants have not shown, therefore, that they are entitled to qualified immunity, nor have they established that Guzman's claim under § 1985(2) is faulty, nor that he has failed to raise a jury issue as to pretext, nor that Plaintiff is attempting to re-litigate issues.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment [Doc. 54] is denied.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge

ATTORNEY FOR PLAINTIFF:
Donna L. Dagnall, Esq.

ATTORNEY FOR DEFENDANTS:
Patricia G. Williams, Esq.
Victor E. Valdez, Esq.
William D. Slease, Esq.
Jonlyn M. Martinez, Esq.